Rick ARMSTRONG, Appellant–
Plaintiff,

v.

CERESTAR USA, INC., f/k/a American
Maize, Inc., Appellee–Defendant.

No. 45A03–0109–CV–314.

Court of Appeals of Indiana.

Sept. 17, 2002.

Adam D. Decker, Austgen, Reed & Decker, P.C., Crown Point, IN, Attorney for Appellant.

Edward A. Sullivan, Thomas J. Brunner, Baker & Daniels, South Bend, IN, Attorneys for Appellee.

**OPINION**

MATHIAS, Judge.

Rick Armstrong ("Armstrong") appeals the Lake Circuit Court's decision to grant Cerestar USA, Inc. f/k/a American Maize, Inc.'s ("Cerestar") Motion to Strike expert testimony submitted by Armstrong and Cerestar's Motion for Summary Judgment. Armstrong's issues on appeal are reordered and restated as:

I. Whether the trial court abused its discretion when it granted Cerestar's Motion to Strike expert testimony submitted by Armstrong;

II. Whether the trial court erred when it granted Cerestar's Motion for Summary Judgment after determining that there was no genuine issue of material fact with regard to three of the five exceptions to the general rule that an employer is not liable for the negligence of an independent contractor; and,

III. Whether the trial court erred when it granted Cerestar's Motion for Summary Judgment after determining that there was no genuine issue of material fact with regard to whether Cerestar, as a landowner, failed to maintain its property in a reasonably safe manner for business invitees.

We affirm.

**Facts and Procedural History**

The facts most favorable to the nonmovant reveal that in April of 1996, Cerestar executed a Purchase Order with Wheelabrator Water Technologies, Inc. ("Wheelabrator"), under which Wheelabrator agreed to remove sludge from two lagoons located at Cerestar's corn wet milling plant in

Hammond, Indiana.[1] Wheelabrator contracted with Luther Daugherty & Sons Trucking, Inc. ("Daugherty") for drivers and trucks, and Daugherty, in turn, contracted with E. Feddeler & Sons Trucking, Inc. ("Feddeler") for drivers and trucks. Feddeler leased several trucks and drivers to Daugherty, including Armstrong, whom it employed as a truck driver. On May 7, 1996, Armstrong fell from atop a tanker trailer while working on the Wheelabrator project at the Cerestar plant.

Under the purchase order agreement between Cerestar and Wheelabrator, Wheelabrator was required to remove sludge from lagoons number three and four, and dispose of it by land application. Appellant's App. p. 394. Cerestar had a Land Application Permit from the Indiana Department of Environmental Management that authorized land application of the sludge. Br. of Appellant at 5–6. The terms and conditions on the back of the purchase order specified, in pertinent part, that Wheelabrator was working as an independent contractor, Wheelabrator was to maintain all necessary insurance coverage, to request advice from Cerestar's safety director about Cerestar's safety regulations and to conform to these regulations. The purchase order also contained an indemnity clause from Wheelabrator to Cerestar. Appellant's App. p. 396. In addition to the requirement of the purchase order, the usual course of dealing between Wheelabrator and Cerestar was such that Wheelabrator would make temporary improvements at Cerestar's facility by constructing all of the dredging and pumping equipment during the time period that it performed the lagoon dredging.

On May 7, 1996, the day of Armstrong's fall, he made three trips to the Hammond plant. On his third trip, he checked in with a security guard at the Cerestar entrance, and then drove to the lagoon area, where he waited in line behind other drivers also working on the project. Once at the sludge pump, Armstrong followed his usual routine: he climbed the ladder on the side of the tanker to the top, put the pipe from the pump into the tanker's hatch, which was about the size of a manhole, and motioned to the pump operator to begin filling the tanker with sludge. Armstrong did not hold the tube while the tanker filled, but had to be aware of when the tanker was full. While his tanker filled, he sat on the flat edging atop the tanker near the hatch. When he noticed that the tanker was adequately full, he stood up to tell the pump operator to shut off the pump. After he signaled to the pump operator, Armstrong began to feel light-headed and sat down again. Appellant's App. p. 264. It was at this approximate time that Armstrong fell from atop the trailer.

During his deposition, Ronald Musch ("Musch"), a Wheelabrator employee who also worked on the project, testified that all of the equipment used on the project in question was owned by Wheelabrator, including the load stand, the hose, the cam lock fitting, the pump, the holding tank, the dredge, and all the pipes and hoses connecting the dredge to the load stand. *Id.* at 94–95. Additionally, Musch testified that Cerestar never directed Wheelabrator

---

**1.** Cerestar is a Maine corporation that manufactures corn syrup, cornstarch, and other corn-based products. Cerestar also operates a wastewater treatment facility at its Hammond plant. Pursuant to the treatment process, Cerestar deposits waste water containing suspended solids into lagoons, where those solids settle on the bottom. The solids are referred to as "sludge," which is ultimately a bio-waste by-product of corn processing. Every few years, the lagoons are dredged and the sludge is removed and used as fertilizer. Br. of Appellant at 5; Br. of Appellee at 2.

in any manner with regard to the dredge operations. Cerestar never provided Wheelabrator with tools, equipment, training, instructions or requirements with regard to removing the sludge. *Id.* at 97–98. Robert Sternberg ("Sternberg"), the Regional Safety Manager for Wheelabrator at the time of Armstrong's accident, also testified that all of the equipment used in the dredging project at the Cerestar plant was owned by Wheelabrator, that Cerestar employees had no control of the operations of the dredging project, and that even though Cerestar, as the client, always had the right to exercise control, it never did at that project because Wheelabrator was the dredging expert. *Id.* at 116–17. Cerestar did however maintain a security guard at the entrance of the facility, an employee to perform traffic control of the trucks entering the facility to haul the sludge, and employees in a nearby lab that had no view of the lagoons.

On April 29, 1998, Armstrong filed a complaint against Cerestar, Wheelabrator, and Daugherty alleging negligence in failing to provide Armstrong with adequate supervision, instruction and/or warning regarding the removal and loading of the sludge onto the tanker trailer. Br. of Appellant at 2. Cerestar denied the allegations and filed a Motion for Summary Judgment on April 16, 2001, including designated evidence. Cerestar argued that it did not owe Armstrong a duty because it did not participate in the removal of the sludge and retained no control over the sludge removal project.

On June 7, 2001, Wheelabrator filed a response to Cerestar's summary judgment motion with attached designated evidence. On June 8, 2001, Armstrong filed a response to Cerestar's summary judgment motion, and also attached designated evidence. Armstrong's designated evidence included a Preliminary Report, created by Kenneth Yotz, Armstrong's expert witness, and excerpts of Yotz's deposition testimony. Cerestar filed a reply brief on July 19, 2001.

On July 31, 2001, Cerestar filed a Motion to Strike Yotz Preliminary Report and Deposition and Memorandum in Support thereof. Cerestar alleged that two of Yotz's opinions were inadmissible under Indiana Evidence Rule 702. Armstrong filed a response to Cerestar's Motion to Strike on August 15, 2001. Cerestar filed a reply brief on the day the trial court heard argument on Cerestar's Motion for Summary Judgment and Motion to Strike, August 24, 2001. After the hearing, in pertinent part, the trial court granted Cerestar's Motion for Summary Judgment and Motion to Strike. The trial court entered its order on September 11, 2001. It is from this order that Armstrong now appeals. Additional facts will be provided as necessary.

## I. Motion to Strike

Armstrong argues that the trial court abused its discretion when it granted Cerestar's motion to strike opinions of Armstrong's expert witness, Yotz. All evidentiary rulings, including those with regard to admissibility of expert testimony, lie within the discretion of the trial court. We may only reverse such decisions if a trial court abuses its discretion. *Hannan v. Pest Control Servs., Inc.*, 734 N.E.2d 674, 679 (Ind.Ct.App.2000), *trans. denied* (citation omitted). An abuse of discretion occurs if the trial court's decision is clearly against the logic and effect of the facts and circumstances before it, or the reasonable, probable, and actual inferences and deductions drawn therefrom. *Id.* (citation omitted). "The proponent of expert testimony bears the burden of establishing the foundation and reliability of the scientific principles and tests upon which the experts'

testimony is based." *Id.* (citing *McGrew v. State,* 682 N.E.2d 1289, 1290 (Ind.1997)).

The trial court struck Yotz's opinions that 1) Armstrong was exposed to a hazardous concentration of hydrogen sulfide gas while pumping the sludge into his tanker; 2) that as a result of the exposure, Armstrong became disoriented and/or lost his balance and fell from atop the tanker; and, 3) that under Occupational Safety and Health Administration ("OSHA") guidelines, the sludge material met the definition of hazardous material. Br. of Appellant at 33. The trial court found that the opinions were unreliable and inadmissible under Indiana Evidence Rule 702, which reads:

> (a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

> (b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Evid. R. 702.

 Indiana Evidence Rule 702 requires that an expert be qualified as such by his knowledge, skill, experience, training, or education. Additionally, "[a]n expert must have sufficient skill in the particular area of expert testimony before the expert can offer opinions in that area." *Hannan,* 734 N.E.2d at 679 (citation omitted). Therefore, before an expert may testify in an area, the proponent of the expert must show that the expert is competent in that area. *Id.* (citation omitted). "Moreover, questions of medical causation of a particular injury are questions of science necessarily dependent on the testimo-

ny of physicians and surgeons learned in such matters." *Id.* (citation omitted).

 Indiana Evidence Rule 702 requires Indiana trial courts to act as gatekeepers of evidence, to ensure that expert testimony is relevant and rests upon a reliable foundation. *Id.* (citing *Wallace v. Meadow Acres Manufactured Hous., Inc.,* 730 N.E.2d 809, 812 (Ind.Ct.App.2000), *trans. denied; Hottinger v. Trugreen Corp.,* 665 N.E.2d 593, 595 (Ind.Ct.App. 1996), *trans. denied* ). Trial courts must preliminarily assess "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* (citation omitted). Scientific knowledge admitted by a trial court under Indiana Evidence Rule 702 must be "more than a subjective belief or unsupported speculation." *Id.* (citation omitted).

 While there is no absolute test for determining when testimony is reliable, some factors are: 1) whether the theory or technique can be or has been empirically tested; 2) whether the theory or technique has been subjected to peer review and/or publication; 3) whether there is a known or potential rate of error, as well as the existence and maintenance of standards controlling the theory or technique's operation; 4) whether the theory or technique is generally accepted within the relevant scientific community. *Wallace,* 730 N.E.2d at 813; *McGrew,* 682 N.E.2d at 1292 n. 5 (both cases citing *Daubert v. Merrell Dow Pharm.,* 509 U.S. 579, 593–95, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)).

 Our analysis must begin with a review of the expert's qualifications. Yotz has a Masters in Business Administration, a Master of Arts in Health and Safety Studies, and a Bachelor of Science in Secondary Education. At the time of trial,

Yotz had served as Vice President and "key representative" at Environmental, Management and Training Systems, Inc., a consulting company specializing in occupational and environmental health and safety issues. Appellant's App. p. 291. For the sixteen previous years, from 1975 until 1991, Yotz held various positions at OSHA. His most recent position at OSHA had been Area Director, from 1986 until 1991, where he implemented and managed a safety and health regulatory program for a seventeen county area, developed strategies and formulated policies to implement agency programs, developed cases, some of which resulted in litigation, achieved negotiated resolution in several cases, issued citations and penalties, and represented the agency at various speaking events. *Id.* at 292. Yotz is also a Certified Safety Professional and a Certified OSHA Instructor for General Industry and Construction.

On September 10, 2000, Yotz created a Preliminary Report, which Armstrong attached as designated evidence to his response to Cerestar's summary judgment motion. In relevant part, Yotz asserted in the Report that Armstrong was exposed to a hazardous concentration of hydrogen sulfide gas while the pump was filling his tanker, and that as a result of this exposure, Armstrong became disoriented and fell from the tanker. *Id.* at 290. Additionally, Yotz testified at his deposition that the sludge material fit within OSHA's definition of hazardous material at 29 C.F.R. 1910.1200. *Id.* at 249. The trial court specifically struck these opinions from the record pursuant to Cerestar's motion.

Yotz testified that the basis for his opinions was the results from testing conducted by Robert Marshall ("Marshall"), Director of Environmental Affairs for Cerestar at the time of the accident, and

Wheelabrator's expert, Sternberg;[2] test results from sampling done by Cerestar over a period of years before the accident for odor control, and Musch's own testimony that he believed Armstrong looked like he was dizzy before he fell, all of which Yotz combined with his background, experience, knowledge, and training. *Id.* at 251.

Yotz admitted that he did not conduct any of his own tests at the Cerestar plant, and that he did not attempt to calculate the level of hydrogen sulfide Armstrong might have been exposed to, because no one could do such a test with any degree of confidence. *Id.* at 253, 375. Additionally, Yotz admitted that although certain factors could affect the level of hydrogen sulfide in the air, such as the temperature, humidity, direction and velocity of the wind, he did not know any of that information for the day of Armstrong's accident. *Id.* at 376. Yotz did not know how tall Armstrong was or what he weighed at the time, which could also affect reactions to hydrogen sulfide exposure. *Id.* Yotz also admitted that he was not aware of the tanker make and model, had never examined the tanker, and had never been involved in or investigated any cases similar to this one. *Id.* at 377. Lastly, Yotz testified that he had not read Armstrong's or Musch's depositions, but had read all of Sternberg's deposition and only parts of others' fact summaries.

Under Indiana Evidence Rule 702, the threshold question is whether the evidence is reliable under Rule 702(b). If it is not reliable, it will certainly not assist the judge or jury, as required by Rule 702(a). *Wallace,* 730 N.E.2d at 813.

Yotz's opinions concluded that Armstrong was exposed to a dangerous level of

---

**2.** Yotz did not rely on Sternberg's testimony for the September 2000 report.

hydrogen sulfide, that Armstrong became ill due to the alleged exposure, and that the sludge material was a hazardous material as defined in OSHA regulations. To reach these conclusions, Yotz relied upon the test results from others, results from tests that were done either at least one day after the accident under different weather conditions, or within years prior to the accident.

In addition, even though one might generalize that exposure to hydrogen sulfide at certain levels could pose health risks, Yotz is not a licensed physician with training, knowledge and experience to make the proximate cause determination that Armstrong became light-headed due to exposure to hydrogen sulfide gas. Additionally, Armstrong never submitted any evidence, testimonial or otherwise, that excluded other possible causes of his fall. As stated above, questions of medical causation, here the cause of the fall, is a question of science necessarily dependent upon testimony by physicians or surgeons with experience in the area. *Hannan*, 734 N.E.2d at 679 (citation omitted).

Lastly, although a trial court could find Yotz to be an expert on OSHA regulations based upon his previous and current employment, any determination made under OSHA regulations in this case is irrelevant as to the issue of whether Cerestar owed Armstrong a duty because an OSHA standard cannot be used to expand an existing common law or statutory duty, or be used as evidence of an expanded duty of care. *Merritt v. Bethlehem Steel Corp.*, 875 F.2d 603, 604–05 (7th Cir.1989) (citations omitted).

For all of these reasons, we conclude that Yotz's opinions were unreliable, no more than subjective belief or unsupported speculation. *See Hannan*, 734 N.E.2d at 679. We therefore conclude that the trial court did not abuse its discretion when it granted Cerestar's Motion to Strike.

## II. Exceptions to the General Rule of Nonliability

Armstrong next argues that the trial court erred when it granted Cerestar's Motion for Summary Judgment because Cerestar should be held liable for Wheelabrator's alleged negligence even though Wheelabrator is admittedly an independent contractor. Specifically, Armstrong argues that a genuine issue of material fact remains with regard to whether three of the five exceptions to the general rule of employer non-liability apply to the facts of this case.

■ Our standard of review of a summary judgment motion is the same standard used in the trial court:

> Summary judgment is appropriate only where the evidence shows there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. All facts and reasonable inferences drawn from those facts are construed in favor of the non-moving party. The review of a summary judgment motion is limited to those materials designated to the trial court. We must carefully review decisions on summary judgment motions to ensure that the parties were not improperly denied their day in court.

*Tom–Wat, Inc. v. Fink*, 741 N.E.2d 343, 346 (Ind.2001) (internal citations omitted); *see also* Ind. Trial Rule 56(C). "When there are no disputed facts with regard to a motion for summary judgment and the question presented is a pure question of law, we review the matter *de novo*." *Aide v. Chrysler Fin. Corp.*, 699 N.E.2d 1177, 1180 (Ind.Ct.App.1998), *trans. denied.* "The party appealing the grant of summary judgment has the burden of persuading this court on appeal that the trial court's ruling was improper." *Hannan*,

734 N.E.2d at 678 (citation omitted). Additionally, where the plaintiff proffers expert testimony to establish causation, the trial court properly enters summary judgment in favor of the defendant where that expert testimony fails to meet Indiana Evidence Rule 702's admissibility test. *Id.* (citation omitted).

 Armstrong's complaint alleges negligence, which is comprised of three elements: 1) a duty on the part of the defendant owed to the plaintiff; 2) a breach of the duty, i.e., defendant's failure to conform his conduct to the requisite standard of care required by the relationship; and, 3) an injury to the plaintiff as a result of the defendant's breach of duty. *Merrill v. Knauf Fiber Glass, GmbH,* 771 N.E.2d 1258, 1264 (Ind.Ct.App.2002) (citation omitted). Additionally, even though "[s]ummary judgment is rarely appropriate in a negligence action[,] . . . when the undisputed material facts negate at least one element of a claim, judgment as a matter of law is appropriate." *Id.* at 1264 (citing *Bamberger & Feibleman v. Indianapolis Power & Light Co.,* 665 N.E.2d 933, 937 (Ind.Ct.App.1996)).

 As Armstrong admits, it is well established that generally an employer is not liable for the negligence of an independent contractor whom he employs. *Cummings v. Hoosier Marine Properties, Inc.,* 173 Ind.App. 372, 385, 363 N.E.2d 1266, 1274 (1977) (citations omitted). Nevertheless, there are also five well-established exceptions when the rule does not apply: 1) where the contract requires the performance of intrinsically dangerous work; 2) where one party is by law or contract charged with a specific duty; 3) where the contracted act will create a nuisance; 4) where the act to be performed will probably cause injury to others unless due precaution is taken to avoid harm; and, 5) where the act to be performed is illegal.

*Id.* (citing *Stewart v. Huff,* 105 Ind.App. 447, 453–54, 14 N.E.2d 322, 325–26 (1938); *Scott Constr. Co. v. Cobb,* 86 Ind.App. 699, 703, 159 N.E. 763, 765 (1928)). Armstrong argues that there is a genuine issue of material fact with regard to whether three of these exceptions apply to this case.

### A. Intrinsically Dangerous Work Exception

 Armstrong first argues that there exists a genuine issue of material fact with regard to whether the removal of the sludge material was intrinsically dangerous work. He argues "that Cerestar possessed knowledge of the potential hazards associated with the loading of the materials into tanker trailers." Br. of Appellant at 18. He also claims that Cerestar knew that the sludge was a hazardous material and that Cerestar knew or should have known that a person standing atop a tanker while overseeing the loading of the sludge material might be exposed to hazardous levels of hydrogen sulfide gas. *Id.* Nevertheless, he fails to direct us to any case law in support of his argument.

 "Inherently dangerous means that the danger exists in the doing of the activity regardless of the method used. It is a risk intrinsic to the accomplishment of the task and not simply a danger arising from a casual or collateral negligence of others." *Cummings,* 173 Ind.App. at 386, 363 N.E.2d at 1275 (citation omitted). "Work is intrinsically dangerous if the risk of injury involved cannot be eliminated or significantly reduced by taking proper precautions." *Shell Oil Co. v. Meyer,* 705 N.E.2d 962, 978 (Ind.1998) (citation omitted).

The *Cummings* court found that the rationale underlying the inherently dangerous exception sounded very much like strict liability, and mentioned the example of blasting. *Cummings,* 173 Ind.App. at

386, 363 N.E.2d at 1275 (citation omitted). The *Cummings* court concluded that excavation of sewer trenches is not intrinsically dangerous because the work, when properly done, "is relatively safe." *Id.* It held that the risk in the case was created because the subcontractor's work departed from its contemplated method, and therefore, "the negligent failure to shore and brace [the trench] was collateral to the risk created by digging the trenches." *Id.* at 386–87, 363 N.E.2d at 1275 (citation omitted).

Our case is analogous to *Cummings*. Guiding a tube into a tanker hatch to fill it with sludge material is not intrinsically dangerous work. None of Armstrong's claims with regard to this exception allege that it was not possible for this work to be done in a safe manner. Any possible risks involved in the work Armstrong performed could have been eliminated or significantly reduced. We therefore conclude that the trial court did not err when it found that there were no genuine issues of material fact with regard to whether the intrinsically dangerous exception applied to the facts of this case.

### B. *Due Precaution Exception*

■ Armstrong next argues that there is a genuine issue of material fact with regard to whether loading the tanker with sludge material would probably cause injury to others unless due precaution was taken to avoid the harm. Armstrong argues that Cerestar knew or had reason to know that Wheelabrator's activities were likely to create harm to others based upon its knowledge of the contents of the sludge material and its alleged knowledge of the manner in which Wheelabrator employees loaded the tankers. Br. of Appellant at

17–18. Our supreme court has explained that

[t]he essence of this exception is the foreseeability of the peculiar risk involved in the work and of the need for special precautions. The exception applies where, at the time of the making of the contract, a principal should have foreseen that the performance of the work or the conditions under which it was to be performed would, absent precautionary measures, probably cause injury.

*Carie v. PSI Energy, Inc.*, 715 N.E.2d 853, 856 (Ind.1999) (quoting *Bagley v. Insight Communications Co.*, 658 N.E.2d 584, 588 (Ind.1995) (citations omitted)).

■ The focus of this exception is foreseeability, i.e., whether at the time the principal and the independent contractor entered into their contract, there was a "peculiar risk which was reasonably foreseeable and which recognizably called for precautionary measures." *Id.* (quoting *Bagley*, 658 N.E.2d at 588).[3] Our supreme court also explained that in order to prevent the "virtual abrogation" of the general rule of nonliability of an employer for negligence of its independent contractors, recovery under this exception will only happen if the plaintiff shows "that in view of the nature of the work and the conditions under which it was to be executed, the defendant should have foreseen that the actual catastrophe which occurred was likely to happen if those precautionary measures were omitted." *Id.* at 857 (citation omitted).

The question becomes whether Cerestar could have foreseen an accident substantially similar to Armstrong's accident, i.e., one in which a truck driver falls from atop

---

**3.** The *Bagley* court's emphasis on foreseeability was combined with its de-emphasis of whether there was a "peculiar risk," which

had been the focus in previous cases analyzing the due precaution exception.

a tanker while the tanker is being loaded with sludge. *Id.* (citing *Carie*, 694 N.E.2d at 737 (Friedlander, J., dissenting)). Wheelabrator had performed the same work for Cerestar several times in the past, and had never before had problems or relied on Cerestar for equipment or training. Wheelabrator had complete control over the manner in which the tankers were loaded. Additionally, no similar accident had ever occurred at the Hammond plant. Under these facts and circumstances, Cerestar could not have foreseen Armstrong's accident when it hired Wheelabrator to perform the dredging, loading and hauling of the sludge material. We therefore conclude that the trial court did not err when it determined that there was no genuine issue of material fact with regard to whether the due precaution exception applied to the facts of this case.

### C. *Assumption by Contract Exception*

■ Armstrong next argues that there exists a genuine issue of material fact with regard to whether Cerestar assumed a duty to insure the safety of all persons working pursuant to the purchase order between it and Wheelabrator. Br. of Appellant at 20.[4] Specifically, Armstrong relies on paragraph 19(b) of the purchase order, which reads: "Seller will obtain advice from Buyer's Safety Director as to Buyer's safety regulations and agrees to conform thereto." Appellant's App. p. 237. Armstrong argues that pursuant to this provision, Cerestar "assumed, at least partially, control of the supervision of safety at the site where the sludge material was being loaded into the tankers." Br. of Appellant at 21.

■ Interpretation of a written contract is achieved by ascertaining "the in-

tent of the parties at the time the contract was executed as disclosed by the language used to express their rights and duties." *Merrill*, 771 N.E.2d at 1268 (citation omitted). We must look to the contract as a whole to determine if a party is charged with a duty of care pursuant to the contract. *Id.* (citation omitted). Moreover, "the 'assumption by contract' exception to the general rule of nonliability is not triggered merely because [a contractor] may have a right to inspect and test the work, approve of the work and/or employees of the independent contractor or require the contractor to follow company safety rules." *Merritt*, 875 F.2d at 607 (citing *Perry v. N. Ind. Pub. Serv. Co.*, 433 N.E.2d 44, 48 (Ind.Ct.App.1982); *Cummings*, 173 Ind. App. at 390–91, 363 N.E.2d at 1274).

In our case, the provisions of the purchase order, taken as a whole, do not evince a duty upon Cerestar to insure the safety of all persons providing service pursuant to the purchase order. In addition to paragraph 19(b) relied on by Armstrong, paragraph 19(a) provides insight into the intent of the parties; it reads:

> In the event that Seller's obligations hereunder require or contemplate performance of services by Seller's employees, or persons under contract to Seller, to be done on Buyer's property or property of Buyer's customers, Seller agrees that all such work shall be done as an independent contractor and that the persons doing such work shall not be considered employees of the Buyer. Seller shall maintain all necessary insurance coverages, including public liability and Worker's Compensation insurance. . . .

Appellant's App. p. 237. There are no provisions in the purchase order that dele-

---

**4.** Although Armstrong does not frame his argument on this issue as an exception to the general rule, we analyze it as such.

gate the duty of inspection to Cerestar. Moreover, the applicable provisions do no more than require Wheelabrator to observe Cerestar's safety rules ("house rules") and require Wheelabrator to obtain such rules from Cerestar. Without more, there is no assumption of duty pursuant to this purchase order. Therefore, we conclude that the trial court did not err when it determined that there was no genuine issue of material fact with regard to whether the assumption of duty exception applied to the facts of this case.

### III. Premises Liability

■ Armstrong's final argument is that the trial court erred when it granted Cerestar's Motion for Summary Judgment because there is a genuine issue of material fact with regard to whether Cerestar, as the landowner, failed to maintain its property in a reasonably safe manner for business invitees. In support of his argument, Armstrong argues that the duty arose out of Cerestar's superior knowledge of the possibility of danger to persons loading the sludge material. Br. of Appellant at 21.

■ In general, a landowner has no duty to furnish a safe workplace to employees of independent contractors. *Merrill*, 771 N.E.2d at 1264–65 (citation omitted). Nevertheless, a landowner has a duty to maintain his property in a reasonably safe condition for business invitees, including employees of independent contractors, and this duty is coextensive with the invitation to come onto the land. *Cummings*, 173 Ind.App. at 383, 363 N.E.2d at 1273 (citation omitted); *see also Burrell v. Meads*, 569 N.E.2d 637, 639 (Ind.1991).

■ In *Burrell*, our supreme court clarified that Indiana follows the Restatement (Second) of Torts § 343 (1965) definition of the duty a landowner owes to an invitee. *Burrell*, 569 N.E.2d at 639–40. It reads:

A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he

(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and

(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and

(c) fails to exercise reasonable care to protect them against the danger.

*Id.* (citing Restatement (Second) of Torts § 343 (1965)). The focus of the inquiry is upon whether the landowner had superior knowledge with regard to any dangers on the premises. *Cummings*, 173 Ind.App. at 383, 363 N.E.2d at 1273 (citation omitted).

Armstrong argues that Cerestar knew or should have discovered that the sludge material could produce a hazardous concentration level of hydrogen sulfide gas, and that Cerestar failed to exercise reasonable care to protect Armstrong against the danger. Br. of Appellant at 23. Because Armstrong's expert's testimony submitted to establish causation failed to meet the Indiana Evidence Rule 702 admissibility test, there is no credible evidence that establishes that the sludge at issue as handled produced a hazardous concentration of hydrogen sulfide gas, let alone whether that alleged circumstance was or should have been known by Cerestar.

The issue then becomes whether Cerestar had superior knowledge with regard to the possible danger of a person falling from atop a tanker trailer. Cerestar had no role whatsoever in the loading of the sludge material into the tankers. Cerestar did not provide any personnel, equipment

or trucks for the project. The security guard at the entrance gate, a man directing truck traffic, and employees in a lab that could not see the lagoons were the only Cerestar employees near the project. Wheelabrator supplied all other personnel working on the project, and had done the same work for Cerestar several times in the past. Because Wheelabrator controlled the site and the employees, we cannot conclude that Cerestar had superior knowledge with regard to the potential danger of a person falling from atop a tanker trailer while loading sludge.[5]

### Conclusion

For all of the above reasons, we conclude that the trial court did not abuse its discretion when it granted Cerestar's Motion to Strike, and it did not err when it granted Cerestar's Motion for Summary Judgment.

Affirmed.

BARNES, J., concurs.

KIRSCH, J., concurs in result with opinion.

KIRSCH, Judge, concurring in result.

I fully concur in the majority decision that summary judgment was appropriately entered for Cerestar USA, Inc.

I reach a different conclusion from the majority on whether the expert testimony was appropriately stricken. I believe that the tendered expert was sufficiently qualified as an expert by his knowledge, skill, experience, training and education, and the specialized knowledge which he possessed would have aided the trier of fact in understanding the evidence. I further believe

that the proponent of the evidence demonstrated that the general methodology was based on sufficiently reliable scientific principles.

In *Sears Roebuck and Co. v. Manuilov,* 742 N.E.2d 453, 460 (Ind.2001), our supreme court noted that Evidence Rule 702 "reflected an intent to liberalize, rather than constrict, the admission of reliable scientific evidence" and that once the threshold is crossed, "the accuracy, consistency, and credibility of the expert's opinions may be left to vigorous cross-examination, presentation of contrary evidence, argument of counsel, and resolution by the trier of fact." I believe the trial court abused its discretion in striking the testimony.

Because I believe the exclusion of the expert testimony was harmless on the question of whether Cerestar USA, Inc. owed a duty to the plaintiff, I concur in the decision affirming the summary judgment.

---

5. Armstrong argues that the fact that Cerestar obtained a permit from the Indiana Department of Environmental Management is evidence of Cerestar's control over the project. The permit involved the land application of

the sludge, not the manner in which Wheelabrator directed the sludge to be loaded into the tankers. The permit therefore is irrelevant to Armstrong's claims.