**SHAWNEE CONSTRUCTION AND ENGINEERING, INC.,**
Appellant–Defendant,

v.

**Don C. STANLEY, Jr.,**
Appellee–Plaintiff.

No. 02A04–1010–CT–610.

Court of Appeals of Indiana.

Sept. 9, 2011.

Jeremy N. Gayed, Michael H. Michmerhuizen, Thomas M. Kimbrough, Barrett & McNagny LLP, Fort Wayne, IN, Attorneys for Appellant.

W.F. Conour, Jeffrey A. Hammond, Conour Devereux Hammond, Indianapolis, IN, Attorneys for Appellee.

## OPINION

BAKER, Judge.

In this interlocutory appeal, we decide whether a general contractor contractually assumed a duty to the employee of a subcontractor. Because neither the contractual language in the Contractor Policy stating that the general contractor is responsible for ensuring that subcontractors are trained in OSHA standards and local safety regulations nor the language in a subcontractor agreement giving the general contractor the right to fine subcontractors that violate rules and regulations affirmatively evinces the contracting parties' intent to charge one of the parties with a duty of care, we conclude that no duty was assumed.

Plaintiff-appellee Don C. Stanley, Jr., (Stanley), the employee of a subcontractor on a construction site was seriously injured when he fell off a ladder while working at the site. He filed a negligence action against the general contractor, defendant-appellant Shawnee Construction (Shawnee), and Shawnee filed a motion for summary judgment. Stanley filed a motion for partial summary judgment wherein he argued that Shawnee contractually assumed a non-delegable duty of care and was therefore vicariously liable for his injuries. The trial court denied Shawnee's motion and granted Stanley's.

Concluding that the trial court erred in granting Stanley's partial summary judgment motion and in denying Shawnee's summary judgment motion, we reverse and remand with instructions for the trial court to grant Shawnee's summary judgment motion.

### FACTS [1]

The facts are undisputed. Omnisource is a national scrap metal recycling company with over 70 processing facilities in the United States. In 2006, Omnisource hired Shawnee as the general contractor for the

---

1. We held oral argument in Indianapolis on August 16, 2011. We thank counsel for their able oral presentations.

complete renovation of an existing building in Fort Wayne that was to become Omnisource's new corporate headquarters. In December 2006, Shawnee entered into a subcontract agreement (the Subcontract Agreement) with C.L. Schust Co., Inc. (Schust) to perform the roofing and sheet metal work for the renovation. On May 22, 2007, Schust employee Stanley fell while descending a ladder at the work site and was seriously injured.

On January 14, 2008, Stanley filed a negligence action against Shawnee. On October 30, 2008, Shawnee filed a motion for summary judgment arguing that it owed no duty to Stanley, that Stanley's injuries were not caused by any breach of duty by Shawnee, and that Stanley's injuries were caused by his own negligence. In support of its summary judgment motion, Shawnee designated affidavits from Shawnee's site manager Bruce Lord, Schust President Robert Schenkel, and Schust employees. Shawnee also designated the Subcontract Agreement.

In his affidavit, Lord stated that as Shawnee's site manager, he was responsible for coordinating the subcontractors at the Omnisource site. He did not hold safety meetings or distribute safety requirements to the subcontractors and their employees. Although he made daily rounds at the job site, he did not inspect subcontractors or their employees for unsafe practices and he did not instruct them on safety issues. Rather, Lord explained that he understood that each subcontractor was responsible for its own safety practices and the safety of its own employees.

In addition, the Subcontract Agreement provides, in relevant part, as follows:

The Subcontractor hereby assumes entire responsibility and liability for any and all damage and injury of any kind or nature whatsoever to all persons, whether employees or otherwise, and to all property, growing out of, or resulting from labor or material both used in the performance of this contract or occurring in connection therewith, and agrees to indemnify and save harmless in the Contractor, and/or Owner and their agents, servants and employees from and against any and all loss, expense, including legal fees and disbursements, damage, or injury growing out of, or resulting therefrom or occurring in connection therewith. . . .

Appellant's App. p. 220

President Schenkel's affidavit revealed that Schust handled its own safety issues, conducted its own safety training, and monitored the safety practices of its own employees. Schust did not expect Shawnee to supervise, monitor, or be involved in Schust's safety practices. In addition, Schenkel explained that Shawnee did not provide Schust with any instruction, training, direction, or supervision pertaining to Schust's safety standards, policies, or practices in its performance of work as a subcontractor at the Omnisource site. Schenkel further understood the Subcontractor Agreement to assign sole responsibility to Schust to set safety standards for its employees, to train its employees in safe work practices, to monitor its employees' compliance with its safety standards at the Omnisource job site, and to discipline any of its employees who failed to meet its safety standards.

The information in the Schust employees' affidavits revealed that at the time of Stanley's fall, Schust had an extensive safety training program for its employees regarding the safe use of ladders. For example, Schust required all of its employees to watch a three-hour safety video and attend additional training presentations on the safe use of ladders. In addition, Schust provided a general roofing safety review discussing the three points of con-

tact rule for climbing ladders; a safety review discussing ladder fall protection; a presentation concerning roofing safety and fall protection; a portable ladder safety presentation; and a comprehensive ladder safety presentation.

Consistent with its training, Schust required its employees to conform to formal safety standards for the proper use of ladders. For example, Schust required its employees to check each ladder for damage prior to use, check that the ladder feet were placed on solid, level ground, tie all ladders securely at the top, and follow the three points of contact rule by keeping three extremities in contact with the ladder while climbing it. Because of this rule, Schust prohibited its employees from carrying tools, drinks, or other items in their hands while using ladders. Schust instead required its employees to use ropes or backpacks when transporting items up and down the ladder. Shawnee did not train, monitor, or supervise Schust's safety practices or employees.

On May 22, 2007, a Schust employee set up a ladder at the Omnisource project. Pursuant to Schust's safety standards, the ladder was placed on solid, level ground and blocked off with patio blocks. The top of the ladder was properly placed against the roof of the building with bungee cords. At least three Schust employees ascended the ladder without any problems. Each of the employees observed that the ladder was properly set up, sturdy, and secure.

Later that morning, Stanley's co-workers saw Stanley approach the ladder while holding a bottle of soda in his hand. After Stanley fell, a co-worker noticed that a bottle of soda had broken against the edge of the roof. The lid was still on the roof, but the rest of the bottle had fallen near Stanley. Soda had spilled down the side of the wall as if Stanley had dropped the bottle while falling from the ladder.

Immediately after Stanley fell, a co-worker checked the ladder for safety. The ladder was still in place, leaning properly against the building. The ladder's top was still secured to the roof with the bungee cords. The ladder's feet were still on level, solid ground, and still secured in place by patio blocks. Two of Stanley's co-workers descended the ladder without any problem.

On April 30, 2010, Stanley filed an amended motion for partial summary judgment wherein he argued that Shawnee assumed a non-delegable duty of care, and that the facts regarding Stanley's own negligence were in dispute. In support of his amended motion, Stanley designated the Subcontract Agreement as well as Omnisource's Contractor Insurance and Safety Policy (the Contractor Policy).

On May 26, 2010, Shawnee filed a reply brief in support of its summary judgment motion and a response in opposition to Stanley's amended motion for partial summary judgment wherein it pointed out that Stanley had failed to submit an executed version of the Contractor Policy, and that Shawnee reserved the right to argue that it did not execute the agreement should developing facts supported that position. On July 15, 2010, the trial court denied Shawnee's motion and granted Stanley's.

On July 21, 2010, Shawnee filed a motion for reconsideration wherein it reminded the trial court that Stanley had failed to provide an executed copy of the Contractor Policy. However, Shawnee further explained that:

> because the language of the Contractor Policy [was] so far removed from the type of language required by Indiana law to invoke the specific contract exception, and because the Court stated that it found the terms of the Contractor Policy and the terms of the Shawnee–

Schust agreement similar for the purposes of determining the existence of a duty, Shawnee has chosen to argue this point on the merits.

Appellant's App. p. 409.

Following a hearing, the trial court issued an order acknowledging that the neither party provided it with a written contract between Omnisource and Shawnee for the renovation project. However, the court explained that Shawnee was required to sign the Contractor Policy in order to be an approved contractor, and as of 2006, Shawnee was included on Omnisource's list of approved contractors. The trial court therefore inferred that Shawnee had to have signed the Contractor Policy and ruled that Shawnee owed a duty to Stanley based on the language in the Contractor Policy and the Subcontract Agreement.

Specifically, the trial court concluded that the following language in the Contractor Policy imposed a contractual duty on Shawnee:

**Contractor agrees that:**

It is the responsibility of the contractor to ensure all employees, workers, agents and subcontractors are trained in Occupational Safety and Health (OSHA) related standard that apply to site working conditions and follow all federal, state and local safety and environmental regulations.

Appellant's Appendix p 234.

The trial court also concluded that the following language in Attachment A to the Subcontract Agreement imposed a contractual duty on Shawnee:

Shawnee Construction has the right to fine subcontractors who are violating OSHA Rules and Regulations.

*Id.* at 221.

Accordingly, the trial court reaffirmed its grant of partial summary judgment in favor of Stanley on the issue of assumption of a non-delegable duty of safety to the employees of subcontractors and denied Shawnee's motion to reconsider on that issue. Shawnee appeals the partial grant of Stanley's motion as well as the denial of its own motion.

## DISCUSSION AND DECISION

### I. Standard of Review

When reviewing a trial court's grant of summary judgment, we apply the same standard as the trial court. *Beatty v. La-Fountaine,* 896 N.E.2d 16, 19–20 (Ind.Ct. App.2008). Summary judgment is appropriate if the pleadings and evidence submitted demonstrate that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. Ind. Trial Rule 56(C); *Beatty,* 896 N.E.2d at 20. All facts and reasonable inferences drawn from those facts are construed in favor of the nonmovant. *Mangold ex rel. Mangold v. Ind. Dept. of Natural Resources,* 756 N.E.2d 970, 973 (Ind.2001). Our review of a summary judgment motion is limited to those materials designated to the trial court. *Id.* We must carefully review a decision on summary judgment to ensure that a party was not properly denied its day in court. *Id.* at 974.

Our review is not altered where a trial court enters findings of fact and conclusions of law thereon, granting a motion for summary judgment. *Decker v. Zengler,* 883 N.E.2d 839, 842 (Ind.Ct.App.2008). In such a context, we are not bound by the trial court's specific findings and conclusions, although they aid our review by providing us with a statement of reasons for the trial court's action. *Id.*

### II. Negligence Claim

As a preliminary matter, Shawnee argues that because Stanley failed to desig-

nate a signed Contractor Policy in support of his motion, "there is a definitional dispute of fact concerning whether the Contractor Policy can be considered for purposes of determining what duties Shawnee has contractually assumed.... Due to the dispute of fact apparent on the face of the summary judgment record alone, the Trial Court erred in granting partial summary judgment in favor of Stanley." Appellant's Br. p. 24. Shawnee further explains that the trial court improperly inferred that since Omnisource used Shawnee as a general contractor, Shawnee was an eligible contractor that must have signed the Contractor Policy. According to Shawnee, although "[t]his might be a reasonable resolution of a disputed fact for a jury to make based upon evidence presented at trial, [d]rawing such inferences is ... manifestly inappropriate for determining the landscape of undisputed facts at summary judgment." *Id.* at n. 8. However, Shawnee goes on to state that the existence of this factual dispute is "largely academic ... [because] even if Shawnee had assented to the terms of the Contractor Policy, that language fails to 'affirmatively evince' any intent by Shawnee to assume a duty of care for the safety of the subcontractor employees." *Id.* At oral argument, Shawnee conceded that the Contractor Policy is properly before this Court. We therefore turn to the merits of the appeal.

### III.   Merits of the Negligence Claim

■ To prevail on his negligence claim, Stanley must show that: 1) Shawnee owed him a duty; 2) Shawnee breached the duty when its conduct fell below a reasonable standard of care; and 3) Shawnee's breach proximately caused a compensable injury to Stanley. *See Kroger Company v. Plonski,* 930 N.E.2d 1, 6 (Ind.2010). Absent a duty there can be no negligence or liability based upon the breach. *Id.* Generally whether a duty exists is a question of law

for the court to decide. *Rhodes v. Wright,* 805 N.E.2d 382, 386 (Ind.2004).

■ An employer does not have a duty to supervise the work of an independent contractor to assure a safe workplace and consequently is not liable for the negligence of the independent contractor. *Armstrong v. Cerestar U.S.A., Inc.,* 775 N.E.2d 360, 369 (Ind.Ct.App.2002). The rationale behind this rule is that a "general contractor typically exercises little, if any, control over the means or manner of the work of its subcontractors, and requires only that the completed work meet the specifications of the owner in its contract with the general contractor." *Harris v. Kettelhut Construction, Inc.,* 468 N.E.2d 1069, 1072 (Ind.Ct.App.1984).

■ However, this Court has recognized five exceptions to this general rule: 1) where the contract requires the performance of intrinsically dangerous work; 2) where one party is by law or contract charged with performing the specific duty; 3) where the performance on the contracted act will create a nuisance; 4) where the act to be performed will probably cause injury to others unless due precaution is taken; and 5) where the act to be performed is illegal. *Merrill v. Knauf Fiber Glass GmbH,* 771 N.E.2d 1258, 1264 (Ind. Ct.App.2002). Duties associated with these five exceptions are considered nondelegable, and the principal is liable for the negligence of the contractor because the responsibilities are deemed so important to the community that the principal should not be permitted to transfer those duties to another. *Bagley v. Insight Communications Co., L.P.,* 658 N.E.2d 584, 587 (Ind.1995).

Here, the trial court concluded that the second exception applies in this case. Specifically, the trial court concluded that each of the following provisions in Omnisource's Contractor Insurance and Safety Policy

and the Subcontract Agreement between Shawnee and Schust imposed a contractual duty of care on Shawnee:

**Contractor agrees that:**

It is the responsibility of the contractor to ensure all employees, workers, agents and subcontractors are trained in Occupational Safety and Health (OSHA) related standard that apply to site working conditions and follow all federal, state and local safety and environmental regulations.

Appellant's App. p. 234.

Shawnee Construction has the right to fine subcontractors who are violating OSHA Rules and Regulations.

*Id.* at 221.

■ The extent of the duty owed, if any, is a matter of contract interpretation. *Perryman v. Huber, Hunt Nichols, Inc.,* 628 N.E.2d 1240, 1244 (Ind.Ct.App.1994). In determining whether a duty exists we will give effect to the intent of the parties as reflected by the language of the contract. *Id.* We will determine the meaning of the contract by examining all of its provisions, not from a consideration of individual words, phrases, or paragraphs alone. *Id.* Where the contract affirmatively evinces the parties' intent to charge one party with a duty of care, actionable negligence may be predicated upon that contractual duty. *Id.* This exception to the general rule of nonliability is not triggered merely because a contractor may have a right to inspect and test the work, approve of the work and/or employees of the general contractor or require the contractor to follow company safety rules. *Armstrong,* 775 N.E.2d at 360. Rather, for this exception to apply, a contract must provide for a specific duty of care. *Beatty,* 896 N.E.2d at 23.

Shawnee contends the trial court erred in concluding that the provisions found in Omnisource's Contractor Insurance and Safety Policy and in the Subcontract Agreement each imposed a contractual duty of care on Shawnee. In support of its contention, Shawnee direct us to *Armstrong,* 775 N.E.2d at 360, and *Merrill,* 771 N.E.2d at 1258, both of which are instructive.

In *Armstrong,* Cerestar executed a contract with Wheelabrator Water Technologies, Inc., wherein Wheelabrator agreed to remove sludge from two lagoons located at Cerestar's corn wet milling plant in Hammond. Wheelabrator contracted with Luther Daugherty & Sons Trucking, Inc., for drivers and trucks. Daugherty in turn contracted with E. Feddeler & Sons Trucking, Inc., for drivers, one of whom was Armstrong. On May 7, 1996, Armstrong fell from atop a tanker trailer while working on the Wheelabrator project.

In April 1998, Armstrong filed a negligence action against Cerestar, Wheelabrator, and Daugherty. Cerestar filed a motion for summary judgment, arguing that it did not owe Armstrong a duty because it retained no control over the sludge removal. Armstrong responded that Cerestar had assumed a duty to ensure the safety of all persons working at the plant pursuant to the purchase order it executed with Wheelabrator. Specifically, Armstrong relied upon paragraph 19(b) of this contract, which provided that the seller (Wheelabrator) would obtain advice from the Buyer's (Cerestar) Safety Director as to the Buyer's (Cerestar) safety regulations and would conform thereto. The trial court granted Cerestar's motion, and Armstrong appealed.

This Court reviewed the entire contract and concluded that when taken as a whole, the contract simply did not evince a duty upon Cerestar to insure the safety of all persons providing services. *Id.* at 371. For example, in addition to paragraph

19(b) relied on by Armstrong, paragraph 19(a) provided the following insight into the intent of the parties:

> In the event that Seller's [Wheelabrator's] obligations hereunder require or contemplate performance of services by Seller's employees, or persons under contract to Seller, to be done on buyer's property or property of buyer's customers. Seller agrees that all such work shall be done as an independent contractor and that the persons doing such work shall not be considered employees of the Buyer [Cerestar]. Seller shall maintain all necessary insurance coverages, including public liability and Worker's Compensation insurance. . . .

*Id.* at 371.

We further noted that there were no provisions in the contract that delegated the duty of inspection to Cerestar. *Id.* at 371–72. Moreover, the applicable provisions did no more than require Wheelabrator to observe Cerestar's safety rules and require Wheelabrator to obtain such rules from Cerestar. *Id.* at 372. We concluded that without more, there was no assumption of duty pursuant to the terms of the contract. *Id.* We further concluded that the trial court properly granted Cerestar's summary judgment motion. *Id.* at 373.

In *Merrill* Knauf contacted Ellerman Roofing about making repairs to the roofs on two of its buildings. The buildings and grounds supervisor at Knauf showed roofing company owner Doug Ellerman that skylights on one of the buildings had metal mesh covers, but skylights on the other building did not. Ellerman Roofing was awarded the job, and Knauf executed a Purchase Order, which provided that Ellerman would "furnish all labor, supervision, materials, tools, machinery, equipment, appliances, shoring, scaffolding, false work, transportation, and all other facilities necessary to perform" the work.

*Merrill,* 771 N.E.2d at 1262. The Purchase Order also incorporated and attached a two-page Standard Articles for Fixed Price Construction Contract and referenced a 50–page Safety Rules and Procedures of Outside Contractors. At some point, Doug Ellerman, as Safety Representative for Ellerman Roofing, signed an Outside Contractor Acknowledgement Form.

On March 30, 1999, Merrill walked up to the roof to get his tools. Merrill knew that the uncovered skylights were unsafe, but on his way back to the worksite, he was distracted by a co-worker. Merrill stepped onto a skylight, fell through it, and landed on the floor approximately 15 feet below. Merrill filed a negligence complaint against Knauf. Knauf moved for summary judgment, arguing that it was not liable under any theory. Merrill filed a cross-motion for partial summary judgment on the issue of duty. Merrill designated the affidavit of a Certified Safety Professional who attested that Knauf had an affirmative duty under the Occupational Health and Safety Act and construction industry standards to cover or guard the skylights. Knauf moved to strike the expert's opinion testimony. The trial court determined that Knauf had no heightened duty to place covers or guards over the skylights pursuant to OSHA. The trial court further determined that Knauf assumed no such duty by contract or conduct. Accordingly, the trial court granted Knauf's motion for summary judgment and denied Merrill's cross-motion for summary judgment.

On appeal, Merrill claimed that Knauf bound itself by contract to place covers or guards over the skylights. Specifically, Merrill relied upon a provision from the purchase order, which reads as follows:

> Technical cognizance hereof shall be the responsibility of Owner's Lew Craig or his designee. Said technical representa-

tive will be responsible for assuring Contractor['s] strict compliance with Owner's Safety Rules and Procedures for Outside Contractors.

*Id.* at 1269. According to Merrill, this provision required Knauf to assure that Ellerman Roofing strictly complied with all OSHA safety regulations. This court noted, however, that the provision spoke only of Knauf's promulgated house rules, and not OSHA promulgated regulations. *Id.*

Merrill also claimed that the Safety Rules and Procedures for Outside Contractors incorporated all OSHA regulations, and that Knauf agreed to take all reasonable steps to make the workplace safe for its outside contractors. We noted, however, that intent is not determined from one sentence. *Id.* Rather, the purchase order specifically made Ellerman Roofing responsible for supervision during the project. Therefore, Ellerman Roofing, not Knauf, was required to observe the applicable OSHA regulations. We pointed out that our courts have refused to extend a specific duty to an owner where the contract merely prescribes safety rules and required the independent contractor to observe those rules or any laws relating to safety. *Id.*

Thus, considering the contract documents as a whole, we found the agreement did not evince an affirmative intent to know OSHA safety regulations and to assure Ellerman Roofing's compliance with each. *Id.* According, we concluded that Knauf was not contractually bound to place covers or guards over the skylights, and the trial court did not err in granting summary judgment in favor of Knauf on this issue. *Id.*

■ Here, as in *Armstrong* and *Merrill*, we conclude that when the Contractor Policy and Subcontract Agreement are taken as a whole, neither contract evinces a duty upon Shawnee to ensure the safety of all persons providing services. For example,

no provisions in these agreements delegate a duty of inspection to Shawnee. Further, in addition to the paragraph relied on by Stanley, the Subcontract Agreement also provides that Schust assumed "entire responsibility and liability for any and all damage and injury of any kind or nature whatsoever to all persons." Appellant's App. p. 220. Further, Schust did not expect Shawnee to supervise, monitor or be involved in Schust's safety practices and understood the Subcontract Agreement to assign sole responsibility to Schust to set safety standards for its employees, to monitor its employees compliance with its safety standards at the Omnisource job site, and to discipline any of its employees who failed to meet its safety standards.

Stanley nevertheless claims that the facts of this case are distinguishable from those in *Merrill*, because they go "well beyond merely requiring that subcontractors comply with applicable safety laws and regulations." Appellee's Brief p. 17. Rather, according to Stanley, Shawnee "expressly incorporated into its Subcontract Agreement the right to *ensure* that its subcontractors actually complied with OSHA rules and regulations by retaining the authority to police the subcontractors['] work on the Project and issuing monetary fines to subcontractors whom it determines have violated OSHA safety regulations." Appellee's Br. p. 17. Stanley further argues that "[b]y retaining the authority to monitor and enforce subcontractor compliance with OSHA safety regulations, Shawnee retained control over job site safety and, thereby, contractually assumed a duty of safety for the Project." *Id.*

However, the facts of the cases that Stanley cites in support of his argument, which were also cited by the trial court, are distinguishable from the facts in this case. For example, in *Stumpf v. Hagerman Construction Corp.*, 863 N.E.2d 871

(Ind.Ct.App.2007), Hagerman Construction contracted with the trustees of Purdue University in 2001 to renovate Pfendler Hall on the Purdue campus. In February 2002, Hagerman entered into a subcontract agreement with Dodd, who then subcontracted with Performance Contracting Incorporated (PCI) to install pipe insulation. Stumpf was a PCI employee who was injured when he fell from a ladder while working on the Pfendler Hall project.

In 2003, Stumpf filed a negligence action against Hagerman. Hagerman filed a summary judgment motion, which the trial court granted. Stumpf appealed and argued that the trial court erred in granting Hagerman's summary judgment motion because Stumpf contractually assumed a duty of care. Specifically, Stumpf relied on paragraph 24 of the General Conditions of the contract between Hagerman and Purdue University, which provides as follows:

> The Contractor shall take all necessary precautions for the safety of employees on the work, and shall comply with all applicable provisions of Federal, State and Municipal safety laws and building codes to prevent accidents or injury to persons on, about or adjacent to the premises where the work is being performed.... Contractor shall designate a responsible member of its organization on the work, whose duty shall be the prevention of accidents.

*Stumpf*, 863 N.E.2d at 877. Stumpf contended that this language indicated an intent by Hagerman to assume a duty of care to all of the employees on the project, and that they were required to ensure that their subcontractors implemented safety procedures.

This court concluded that the language of this contract specifically assigned Hagerman the duty to provide for the safety of its employees and to prevent injury to

employees. *Id.* at 878. We further concluded that Hagerman contractually agreed to administer and comply with OSHA regulations. *Id.* Hagerman was also contractually required to designate a member of its staff whose duty would be to prevent accidents. *Id.* We therefore concluded that by virtue of its contract with Purdue University, Hagerman assumed a duty of care for its subcontractors' employees. *Id.*

In *Perryman v. Huber, Hunt & Nichols, Inc.,* 628 N.E.2d 1240 (Ind.Ct.App.1994), Huber, Hunt & Nichols, Inc., (HHN) entered into a construction management agreement (contract) with Monument Towers Limited Partnership (MTLP) in 1987 for the construction of the Bank One Tower Project. The contract provided in relevant part:

> The Construction Manager [HHN] hereby agrees that it will comply with all applicable state and federal statutes and other governmental regulations pertaining to employment, and that it will require like compliance therewith from all Trade Contractors related to the Project.

*Id.* at 1244. The contract also provided that HHN was responsible for reviewing the safety programs of its subcontractors and in making recommendations. In fact, HHN employed a safety officer to oversee its subcontractors' operations.

In 1987, MTLP and HHN entered into a trade contract with Owen Steel for the erection of the structural steel component of the project. In August 1987, Owen entered into a subcontract with Ben Hur Construction Company for the erection of structural steel. On March 28, 1988, Ben Hur employee Perryman was working as a connector in charge of setting the four largest steel I-beam columns in Indiana onto the skeletal steel structure of the Bank One building, when he fell 90 feet to his death.

Perryman's widow field a negligence complaint against HHN. HHN filed a summary judgment motion, which the trial court granted. The widow appealed and challenged the trial court's conclusions that HHN did not contractually assume a duty of project site safety. This Court determined from the very specific contract language in the CMA relating to safety that the parties had clearly intended to charge the general contractor with a duty of care for the safety of all employees on the project and, therefore, reversed the trial court's grant of summary judgment in favor of HHN. *Id.*

Here, however, neither the Company Policy nor the Subcontract Agreement contains specific language that the parties clearly intended to charge Shawnee with a specific duty of care for the safety of all employees on the project. Further, although in *Perryman,* HHN employed a safety officer to oversee its subcontractors' operations, and in *Stumpf,* Hagerman was contractually required to designate a member of its staff whose duty would be to prevent accidents, Shawnee had no such safety officer. Rather, Shawnee employed a site manager who made daily rounds at the job site but had no responsibility for the safety practices of subcontractors or their employees. Because Shawnee did not contractually assume a duty to Stanley, the trial court erred in granting partial summary judgment in favor of Stanley and in denying Shawnee's summary judgment motion.

Judgment reversed and remanded with instructions that the trial court grant Shawnee's summary judgment motion.

MAY, J., and MATHIAS, J., concur.