Patricia PERRYMAN, Administratrix of
the Estate of Norman A. Perryman,
Appellant–Plaintiff,

v.

HUBER, HUNT & NICHOLS,
INC., Appellee–Defendant.

No. 73A04–9309–CV–327.[1]

Court of Appeals of Indiana,
First District.

Feb. 14, 1994.

Robert C. Price, Price & Runnells, Bloomington, for appellant-plaintiff.

Bruce L. Kamplain, Norris, Choplin & Schroeder, Indianapolis, for appellee-defendant.

BAKER, Judge.

When does a construction manager, by contract or conduct, assume a duty to ensure the safety of employees working on a construction site?

■ Appellant-plaintiff Patricia Perryman (Perryman), as administratrix of the estate of her husband Norman Perryman, challenges the trial court's grant of summary judgment in favor of appellee-defendant Huber, Hunt, & Nichols, Inc. (HHN) in her wrongful death action. Perryman contends that the trial court erred in not concluding that HHN, either by contract or conduct, assumed a duty to require all workers to comply with safety regulations.[2]

## FACTS [3]

The facts most favorable to Perryman, as the nonmovant, are that on July 30, 1987, HHN entered into a construction management agreement (CMA) for the construction of the Bank One Tower Project with Monument Tower Associates Limited Partnership (MTALP), the owner.[4] All parties contract-

---

2. HHN contends that Perryman has waived all issues in her appeal for failure to raise them in her motion to correct errors. This claim is without merit. First, Ind.Trial Rule 59 requires a motion to correct errors in two instances only, neither of which applies here. A motion to correct errors on all other issues is merely permissive, and any such issue appropriately preserved may be initially addressed in the appellate brief. See Ind.Trial Rule 59(B). Second, Perryman has always contended that HHN assumed a duty of project site safety by contract and conduct.

HHN also claims that Perryman failed to designate Article 12.13 of the construction management agreement to the trial court as evidence it relied upon to oppose HHN's summary judgment motion, and thus, we may not consider it. We disagree. In Perryman's motion opposing summary judgment, she specifically designated and relied upon the entire construction management agreement, thus satisfying Ind.Trial Rule 56.

3. Although Perryman couched her issues in terms of whether there were any genuine issues of material fact as to whether, through contract or conduct, HHN assumed a duty to ensure employee safety, she actually challenges the trial court's conclusion (based on undisputed facts) that HHN did not assume such a duty. Nonetheless, Perryman's pleadings are sufficient. In Indiana, no technical forms of pleadings or motions are required. Ind.Trial Rule 8(E)(1). Furthermore, we construe all pleadings as to do substantial justice, lead to disposition on the merits, and to avoid litigation of procedural points. Indiana Trial Rule 9(F).

4. The project included a high rise office building, parking facilities, and site improvements at the southwest corner of Ohio and Pennsylvania streets in Indianapolis, Indiana.

ing with HHN or MTALP later agreed that this CMA contract took priority over all other contracts, so that in the case of conflict, the CMA provisions would apply.

Under the CMA, HHN agreed to cause to be performed all construction required for the project. It agreed to comply with all applicable state and federal statutes and other governmental regulations pertaining to employment and to require like compliance therewith from all trade contractors related to the project. HHN had exclusive authority to manage, direct, and control work on the entire project and full control over employees on or about the project, with the right to discharge or remove anyone who, in HHN's opinion, was unfit or guilty of improper conduct. HHN assumed full responsibility for its employees, agents, and subcontractors.

Additional duties and responsibilities assumed by HHN under the CMA included: (1) maintaining a competent full-time staff at the project site to direct and monitor the work of trade contractors, (2) determining the adequacy of trade contractors' personnel and equipment, (3) providing necessary supervision and equipment not provided by trade contractors, (4) requiring trade contractors to obtain all necessary permits, (5) reviewing safety programs of each trade contractor and making appropriate recommendations, and (6) maintaining records at the project site on all equipment and maintenance. HHN further agreed to indemnify MTALP for liability from all damage claims for bodily injury, including death, sustained by any person, including the employees of any trade contractor or subcontractor performing work on the project. Record at 147.

On January 8, 1987, MTALP and HHN entered into a trade contract with Owen Steel Co. for the erection of the structural steel component of the project. The parties incorporated the CMA into this contract, providing that the CMA had the highest priority. Under the Owen contract, Owen agreed to (1) be bound by the terms of the CMA between MTALP and HHN, (2) submit to HHN's supervision and direction and to conform to HHN safety policies, (3) maintain insurance policies listing HHN as an insured, (4) abide by all Occupational Safety and Health Administration (OSHA) safety regulations, (5) assume liability of any safety violation by Owen, its agents or employees, (6) report any injury to HHN, and (7) indemnify MTALP and HHN for all costs or damages incurred as a result of safety violations by Owen or its subcontractors.

On August 10, 1987, Owen entered into a subcontract with Ben Hur Construction Company (Ben Hur) for the erection of structural steel for the project. The CMA and the Owen contract were incorporated into the Ben Hur contract. In this contract Ben Hur agreed to (1) submit to HHN's supervision and direction and to conform to HHN safety policies, (2) abide by all safety regulations, (3) report any injury to HHN, and (4) indemnify Owen for any liability arising out of any personal injury, including death, of Ben Hur's agents.

At the project site, HHN employed Robert Wooten as its safety officer and assistant field superintendent.[5] Although Wooten was primarily concerned with HHN's personnel, he would make daily inspections of all contractors' employees to ensure that they were working safely and obeying all HHN and OSHA safety regulations. If Wooten saw a worker who was in a dangerous situation, he would directly intervene. If Wooten saw something that did not look right or safe, he would tell the worker's foreman about it and expect it to be corrected. If the foreman did not correct the unsafe condition, Wooten would contact the foreman's job site supervisor. If Wooten could not get compliance out of the contractor, he would report the violation to HHN's project manager. Wooten expected every contractor to follow OSHA rules and regulations.

On March 28, 1988, Ben Hur's employees, Mike Dodson and Norman Perryman, were working as connectors of the five-member raising gang in charge of setting the four largest steel I-beam columns in Indiana onto the skeletal steel structure of the Bank One

---

**5.** Wooten had been in the iron working business for approximately 28 years and had worked as an iron connector for several years.

building.[6] Norman had climbed freehand approximately 20 feet up a 30 to 35 foot column when he began to struggle. Norman fell down the column and then off the side of the building, falling approximately two feet away from the side of the building and approximately 90 feet down to his death.

When Norman fell to his death, HHN did not have any nets on the exterior of the building, and it did not require any other contractor to have them. Federal OSHA regulation, 29 C.F.R. § 1926.105, requires that when workplaces are more than 25 feet above the ground and the use of ladders, scaffolds, catch platforms, temporary floors, or safety belts is impractical, nets extending out eight feet beyond the edge of the work surface must be used.

Perryman filed a complaint against HHN alleging its negligence and failure to enforce federal OSHA regulations were the proximate cause of her husband's wrongful death. HHN filed a motion for summary judgment, which the trial court granted. Perryman then filed a motion to correct errors, which the trial court denied. Perryman challenges the trial court's conclusions that HHN did not assume a duty of project site safety by contract or conduct.

## DISCUSSION AND DECISION

### I. Standard of Review

When reviewing the grant of summary judgment, we face the same issues that were before the trial court and follow the same process, giving no deference to the trial court's judgment. *Inland Steel v. Pequignot* (1993), Ind.App., 608 N.E.2d 1378, 1381, *trans. denied.* We carefully scrutinize the trial court's determination to ensure that the nonprevailing party is not improperly prevented from having his day in court. *Oelling v. Rao* (1992), Ind., 593 N.E.2d 189, 190. We consider only the materials specifically designated to the trial court to determine whether there is a genuine issue as to any material fact and whether the moving party is entitled to a judgment as a matter of law. Ind.Trial Rule 56(C). We liberally construe all inferences and resolve all doubts in the nonmovant's favor. *Inland Steel,* at 1381.

### II. Contractual Responsibilities

Perryman contends that the CMA contract between MTALP and HHN imposed upon HHN a nondelegable contractual duty to enforce state and federal employment safety regulations during the course of construction of the Bank One Tower project. Specifically, Perryman claims that when Article 12.13 is examined together with other CMA provisions, it is clear that HHN had a duty to Norman and all project workers to enforce a state employment regulation and a federal OSHA regulation both of which required safety nets be used whenever employees work more than 25 feet above the ground.[7] Perryman argues that the trial court erred in concluding that because Owen and Ben Hur

6. As connectors, Dodson and Norman were in charge of guiding large beams of iron being raised by a crane onto the structure and then bolting the beams into place. Dodson and Norman would climb the beams freehand by pulling themselves up the side of the flange with their hands while grasping the beam with their legs. After the beams were in place, Dodson and Norman would bolt them down and then release the crane rigging.

Norman and Dodson, like other connectors at the project, did not tie off with safety belts so that they could avoid swinging steel. In addition, no ladders were available to the men to assist them in climbing the beams.

7. The Indiana Construction Industry Safety Code regulation which Perryman relies upon, 610 I.A.C. 5–1–29(31), was repealed on January 15, 1988, two months prior to Norman's death, and therefore has no application in this case. *See Allen County Department of Public Welfare v. Potthoff* (1942), 220 Ind. 574, 44 N.E.2d 494 (when a rule or statute is repealed that rule or statute is considered as if it had never existed); *Martin v. Simplimatic Engineering Corp.* (1979), 181 Ind.App. 10, 390 N.E.2d 235, 237 (no cause of action under safety rule which was repealed before plaintiff's injury).

However, this is of no consequence because 29 C.F.R. § 1926.105(a) was in effect at the time HHN and MTALP entered into their CMA and when Norman fell to his death on March 28, 1988, and is substantially identical to the repealed state regulation. Both regulations required safety nets be used around employees working more than 25 feet above the ground.

agreed to comply with all state and federal regulations in their respective contracts that this relieved HHN of its project-wide duty to enforce safety regulations.

"A duty of care, the breach of which will support a negligence action, may arise contractually." *Plan–Tec, Inc. v. Wiggins* (1983), Ind.App., 443 N.E.2d 1212, 1218.[8] The extent of the duty owed, if any, is a matter of contract interpretation. *Id.* In determining whether a duty exists we will give effect to the intent of the parties as reflected by the language of the contract. *Id.* We will determine the meaning of the contract by examining all of its provisions, not from a consideration of individual words, phrases, or paragraphs alone. *Jones v. City of Logansport* (1982), Ind.App., 436 N.E.2d 1138, 1143. Where the contract affirmatively evinces the parties' intent to charge one party with a duty of care, actionable negligence may be predicated upon that contractual duty. *Plan–Tec*, at 1218.

Here, Article 12.13 of the CMA agreement between HHN and MTALP provides: "The Construction Manager [HHN] hereby agrees that it will comply with all applicable state and federal statutes and other governmental regulations pertaining to employment, and that it will require like compliance therewith from all Trade Contractors [Owen, Ben Hur] related to the Project." Record at 154. Article 12.15 provides: "Any reference in the Contract Documents to "General Contractor" shall mean "Construction Manager" [HHN] and any reference to "subcontractors [Ben Hur] or material suppliers" shall mean "Trade Contractors [Owen]."" Record at 154. Thus, the trade contractors referred to in

Article 12.13 include both Owen and Ben Hur. The CMA also provided that HHN was responsible for (1) maintaining a competent full-time staff at the job site to direct and monitor trade contractors' working on the project, (2) determining the adequacy of the personnel and equipment of Owen and Ben Hur, (3) providing all supervision, equipment, and work items not provided by Owen and Ben Hur, and (4) reviewing the safety programs of Owen and Ben Hur and making recommendations.

HHN had complete authority over the project, with the power to fire any person HHN thought was guilty of improper conduct. The CMA was made a part of Owen and Ben Hur's contracts and took priority over those contracts in case of conflict.

It is clear from the express terms of the CMA, that HHN accepted a contractual duty to require Owen and Ben Hur to install safety nets as required by the federal OSHA regulation or to install the nets itself.[9] Because, HHN assumed a contractual duty to comply with all employee safety regulations, including 29 C.F.R. § 1926.105(a), and to require Owen and Ben Hur to comply with such regulations, it is potentially liable to Perryman. *See Allison v. Huber, Hunt & Nichols, Inc.* (1977), 173 Ind.App. 41, 362 N.E.2d 193 (where HHN contracted with owner to take precautions to protect all persons from injury at the job site and to comply with all regulations, HHN was potentially liable to an employee of a subcontractor who was injured).

The fact that Owen and Ben Hur also accepted a duty to comply with the same

8. The three elements of a negligence action are (1) a duty flowing from the defendant to the plaintiff, (2) a breach of that duty, and (3) injury to the plaintiff stemming from defendant's breach. *Tucher v. Brothers Auto Salvage Yard, Inc.* (1991), Ind.App., 564 N.E.2d 560, 562, *trans. denied.* We are concerned with the first element only in this appeal. The second and third elements are questions to be resolved by the trier of fact, if we first find that HHN owed a duty to Norman.

9. There are many other facts which support our finding that HHN assumed a contractual duty to

comply with all safety regulations and to require others to do the same, including: (1) HHN employed Wooten as a full-time safety officer on the project site, (2) Wooten made daily inspections to make certain employees of all contractors were working safely and complying with safety regulations, (3) Wooten expected every contractor to follow safety regulations, (4) Wooten made certain that any unsafe condition at the project site was corrected, and (5) provisions contained in Owen's trade contract and Ben Hur's subcontract regarding HHN's supervision, control, insurance, indemnification, etc.

regulations making them potentially liable to Perryman does not in any way alter HHN's duties or liabilities under the CMA.[10]  *See Allison,* at 195–96 (a party may accept by contract a duty of care for the safety of third persons that is not abrogated in the presence of an intervening independent contractor). This merely makes all three parties potentially liable. *See id.* at 196 (both HHN and subcontractor are liable if they each assume a duty of care in their respective contracts); *City of Anderson v. Fleming* (1903), 160 Ind. 597, 67 N.E. 443 (independent contractor assumed a duty to protect the public from danger arising from excavation in contract with City, thus making the contractor and the City, which could not delegate away its duty, potentially liable to injured woman).[11]

The trial court erred in concluding that HHN did not have a contractual duty to enforce safety regulations at the project site during construction, and thus, in granting HHN's motion for summary judgment.

### III.  Conduct

 Perryman contends that HHN also assumed a duty to ensure safety at the construction site through its conduct during the course of construction. We note that a duty of care may arise where a party voluntarily or gratuitously assumes such a duty. *Plan–Tec,* at 1219. However, because we have found that HHN assumed a contractual duty

of project site safety, we need not address whether by its actions HHN may have undertaken this duty.

### CONCLUSION

HHN did assume a contractual duty to enforce all state and federal employment safety regulations on a project-wide basis during the course of construction of the Bank One Tower project; therefore, the trial court erred in granting HHN's motion for summary judgment. Although we have established that HHN assumed this duty, whether HHN breached this duty and, if so, whether HHN's breach was the proximate cause of Norman's death are questions remaining for the trier of fact.

Judgment reversed and remanded for further proceedings not inconsistent with this opinion.

NAJAM and STATON, JJ., concur.

---

10.  Generally, one is not liable for the acts or negligence of another, unless a master-servant relationship exists between them or the party accepts a contractual duty. *Allison,* at 195. Thus, if HHN had wanted to avoid liability for injuries to employees of Owen and Ben Hur, it would have simply not included Article 12.13 in the CMA.  If HHN wanted to be even more certain of avoiding such liability it could not only have excluded Article 12.13, but it could have included a provision with language opposite of that contained in Article 12.13 expressly disavowing responsibility. *See Plan–Tec,* at 1218 (construction manager did not assume a duty to maintain safety on the project for subcontractor's employee where its contract with the owner included a provision that "[i]n no case shall the Owner, the Construction Manager, the Architect or their respective employees and agents have either direct or indirect responsibility for matters related to Project safety" even though in another provision the construction manager accepted a safety duty for his work).

11.  The effect of the assumption of the same responsibility by Owen and Ben Hur and the corresponding indemnification provisions is to merely grant HHN a right to seek indemnification from either Owen or Ben Hur for expenses and damages it may incur as a result of lawsuits such as this one.